## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Timothy Pine, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, in Denver, Colorado. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7) and am authorized under the Federal Rules of Criminal Procedure, Rule 41(a)(1)(C) to request a Search Warrant.

2. I have been employed as a Special Agent (SA) with ATF since March 2014. My primary duties consist of the enforcing federal firearms laws, particularly those related to firearms and armed narcotics trafficking. My duties routinely include investigating and participating in investigations involving armed and violent gang members and conspiracies among gang members. Prior to becoming a SA, I was employed as a Police Officer by the Wichita Police Department in Wichita, Kansas from 2011 until 2014. I assisted in the investigation and apprehension of individuals involved in state and federal criminal acts. Prior to a career in law enforcement, I received a Bachelor's Degree in Criminal Justice from Metropolitan State College of Denver and a Master's Degree in Leadership with a specialization in Human Resources from Colorado State University.

3. During the course of my career, I have written and/or participated in the execution of over fifty Federal and State Search Warrants involving organized crime, illegal firearms possession and use, armed narcotics trafficking, and criminal organizations. The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations and experience, as well as information obtained from my review of investigative reports, interviews and debriefings with participating officers, detectives, and agents who have participated in the various investigations detailed herein.

4. This affidavit is submitted in support an application for a search warrant for one cellular phone (also referred to as electronic device). The cellular phone was seized on November 28, 2018, from MARSHALL's property bag from the Denver Sheriff's Detention Center. The electronic device was placed into the ATF Property/Evidence Vault at 950 17th Street, Denver, Colorado 80202, and remains in the same material condition. These electronic devices are described more fully in Attachment A and below.

5. Based on the facts in this affidavit, I submit the facts below provide probable cause to believe MARSHALL's phone, more fully described in Attachment A, contains evidence, fruits, and are instrumentalities of the possession of a firearm and ammunition by a prohibited person in violation of 18 U.S.C.§ 922(g)(1); knowingly make any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter in violation of 18 USC § 924(a)(1)(A); and …acquisition or attempted acquisition of any firearm … from a licensed dealer … to make any false or fictitious oral or written statement … intended to deceive such dealer with respect to any fact material to the lawfulness of the sale in violation of 18 U.S.C. § 922(a)(6). Therefore, I seek permission to search those for the items listed with particularity in Attachment B. The electronic device is as follows:

- Apple IPhone with cracked screen and cracked glass on back of phone

## INVESTIGATION

6. According to Denver Police Department (DPD) General Offense (GO) #2018-782614, on November 16, 2018, at approximately 8:06pm, Officer Zachary Linn observed a male, later positively identified as Malek Marshall, riding a red 2014 Honda motorcycle southbound on South Holly Street south of East Evans Avenue.

7. Officer Linn observed that MARSHALL was not wearing eye protection, in violation of Municipal Ordnance Section 54-630 and observed that there was no license plate on the motorcycle, in violation of Municipal Ordnance Section 54-62(a). Officer Linn conducted a traffic stop on the motorcycle at East Iliff Avenue and South Holly Street, Denver, Colorado. The motorcycle pulled into the parking lot of Kindercare located at 2200 South Holly Street.

8. MARSHALL got off the motorcycle and Officer Linn contacted him. Officer Linn observed that MARSHALL was wearing baggy clothing that obscured his waistband. Officer Linn asked MARSHALL for his drivers license. As MARSHALL was digging into his pockets, Officer Linn noticed a bulge in MARSHALL's zip up jacket.

9. According to the report, Officer Linn grabbed MARSHALL's right hand and commanded him to put his hands behind his back. Officer Linn said MARSHALL initially refused. Officer Linn then pulled MARSHALL's hands behind his back. Officer Linn handcuffed the MARSHALL due to his furtive movements in his pockets. Officer Linn asked the MARSHALL if he had anything illegal on him. MARSHALL said he had a firearm in his pocket. Officer Linn retrieved a Springfield, Model XD, .45 caliber semi-automatic handgun with serial number GM420421, out of MARSHALL's front right zip up jacket pocket. MARSHALL said he had another magazine for the pistol in his pocket. Officer Linn then retrieved the magazine out of the MARSHALL's front left pocket. Additionally, MARSHALL was had a large baggy full of marijuana in his pocket

10. An additional officer arrived and Officer Linn placed MARSHALL into the back of his patrol vehicle. Officer Linn unloaded the handgun and observed that the handgun magazine was full of ammunition and the pistol had one round of ammunition in the chamber. A total of twenty-two rounds of .45 caliber ammunition were recovered. Officer Linn checked the serial number of the handgun through records and found the handgun had not been reported stolen.

11. A criminal history check on MARSHALL was completed which revealed that he was previously convicted for Second Degree Burglary. MARSHALL was arrested for Possession of a Weapon by Previous Offender.

12. On November 19, 2018, your Affiant contacted Officer Linn by phone and asked Officer Linn for additional detail on MARSHALL's contact and arrest. Officer Linn said after he asked MARSHALL for his driver's license, he noticed MARSHALL spending most of his time "digging" in his jacket pockets. Officer Linn said he observed a bulge at that time in MARSHALL's midsection, under his jacket and believed that the bulge was a weapon, specifically a handgun. The area described would have been the portion of the front of MARSHAL's jacket pockets that hung down due to the weight of the item in MARSHAL's pocket.

13. Officer Linn said that is why he immediately grabbed MARSHALL's right hand after he

observed the object under MARSHALL's clothing. Officer Linn said when he grabbed MARSHALL's right hand, MARSHALL tensed up and would not take his hand out of his right jacket pocket. Officer Linn said that is when he moved MARSHALL's hands behind his back. Officer Linn said he did not remember if he gave MARSHALL a verbal command to get his hands out of his pockets because it happened so quickly.

14. Your Affiant researched MARSHALL's criminal history and found that on March 29, 2016, MARSHALL was arrested for burglary of a residence. MARSHALL later pled guilty to Burglary (F4) and was sentenced on 01/30/2017 under Denver County District Court case #2016CR3932. In addition, MARSHALL is under indictment for Controlled Substance Possession under Denver County District Court case #2018CR7146, while on probation for his Burglary case.

15. On November 28, 2018, your Affiant advised MARSHALL of his *Miranda* rights, which he indicated he understood and agreed to waive. Your Affiant interviewed MARSHALL about his possession of the firearm. MARSHALL admitted to possessing the firearm for several weeks. MARSHALL also admitted that he purchased the firearm from a "crackhead" for $250, but stated that he did not know the name of this individual.

16. During the booking process into the United States Marshal's Service, I told MARSHALL that his property, other than his phone would be released to his family. MARSHALL asked why his phone was not going to be released to his family. I told MARSHALL that a search warrant would be obtained and executed on the phone. MARSHALL told me that he did not want me to search his phone. I told MARSHALL that I was not asking for consent to search the phone. I told MARSHALL that I was going to get a search warrant to search the phone. MARSHALL said he did not want me to search the phone.

17. On December 12, 2018, the firearm trace for the Springfield, Model XD, .45 caliber semi-automatic handgun with serial number GM420421 was completed. The Trace Results show that William Whitfield was the purchaser of the firearm from 5280 Armory in Arvada, Colorado on August 31, 2018. The firearm was recovered on MARSHALL on November 16, 2018, approximately seventy-seven days after Whitfield purchased the firearm. In the last three years, at least nine additional firearms recovered in various crimes including one homicide have been traced back to Whitfield. Of those traces, most of the firearm were recovered within three months of Whitfield's purchase of the firearms. In addition, SA Pine knows that both MARSHALL and Whitfield are Tre Tre (33) Crip gang members and have a connection based on their gang affiliation.

18. On December 14, 2018, ATF SA Ryan McKone and ATF Industry Operation Investigator (IOI) Jason Clemons interviewed William Whitfield about the purchase of the firearms. Whitfield indicated that all but one of his firearms were left in his vehicles and were stolen by his associates/friends over the last few years.

19. In light of the facts outlined above, it is believed that access to the requested electronic device will assist investigators in determining from whom MARSHALL acquired the firearm. It is believed that Whitfield purchased the firearm for MARSHALL and that communications regarding this could be on the phone. In addition, I know from previous phone downloads from other search warrants that gang members often communicate about the crimes before, during, and after the commission of a crime using their phones.

**INFORMATION ABOUT SEARCHING CELL PHONES / ELECTRONIC DEVICES**

20. Based on my training and experience, I know the following about cellular phones:

21. Most cellular telephones are equipped with a digital camera. A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable digital storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media includes various types of flash memory cards and miniature hard drives. This storage media can contain any digital data, including data unrelated to photographs or videos such as texts, word processing documents, or web pages. If the camera is equipped with global positioning system ("GPS") technology, that information may be recorded as metadata associated with the photographs and videos taken with that camera as well as other information such as the make and model of the camera and the date and time the image was created. Some cameras and removable storage media are now equipped with wireless capabilities, which allow for images and files to be uploaded from the camera or digital storage media directly to the Internet or to other digital storage devices or computers using a wired or wireless connection.

22. A cellular telephone, also referred to as a wireless phone for purposes of this affidavit, is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.

23. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations.

24. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications or "apps". Apps, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

25. A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

26. Based on my knowledge, training, and experience, I know that digital storage devices, including smart cellular phones, can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

27. Based on my knowledge, training, and experience, examining data stored on cellular telephones can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

28. There is probable cause to believe that things that were once stored on the device may still be stored there, for at least the following reasons: Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.

29. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

30. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the device that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of the use, who used the devices, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store

b. configuration information on the storage medium that can reveal information such as online nicknames and passwords.

c. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

d. A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

e. The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a digital storage device is evidence may depend on other information stored on the digital storage device and the application of knowledge about how a digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

f. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

g. I know that when an individual uses an electronic device to aid in the commission of a crime, particularly crimes involving gangs, the individual's
electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: calls, emails, texts, and voicemails between an conspirators involved in acquiring and selling illicit weapons; GPS searches and information associated with traveling in order to distribute firearms; internet searches pertaining to firearms; photographs and/or videos exchanged between an individual distributing firearms and individuals attempting to purchase firearms; social media apps such as Facebook or Instagram, where the phone owner may be communicating with others regarding firearms; email accounts with emails containing communications of firearms. Additionally, devices are often used to call, text, send photos and email information to criminal associates before, during, and after crimes to assist in the crimes both in planning, executing, and fleeing from the crime scene, and that information is likely contained in the memory of the cell phone.

## CONCLUSION

31. I submit the facts above provide probable cause to believe MARSHALL's cell phone, more fully described in Attachment A, contains evidence, fruits, and are instrumentalities of the possession of a firearm and ammunition by a prohibited person in violation of 18 U.S.C.§ 922(g)(1); knowingly make any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter in violation of 18 USC § 924(a)(1)(A); and …acquisition or attempted acquisition of any firearm … from a

licensed dealer … to make any false or fictitious oral or written statement … intended to deceive such dealer with respect to any fact material to the lawfulness of the sale in violation of 18 U.S.C. § 922(a)(6).  Therefore, I seek permission to search those for the items listed with particularity in Attachment B.

                                                _s/Timothy Pine_
                                                Timothy Pine, Special Agent
                                                ATF

Submitted, sworn to, and acknowledged by reliable electronic means on January 18, 2019.

                                                HON. Kristen L. Mix
                                                United States Magistrate Judge
                                                District of Colorado

**This Application and Affidavit was reviewed and submitted by AUSA Celeste Rangel.**